John, please, we have conferred. You may approach. You may approach. Thank you. Your Honor, as a result of your ruling, we have conferred on those issues that may be sensitive in nature with respect to the sealed brief, and we think we have identified them, and we both have agreed that we will refrain from discussing or identifying those sensitive issues. Okay. So I don't think there's any further way to narrow down what those issues are. Well, you're only one side of the equation in terms of discussion. Yes, Your Honor. We ask questions, too. Is there something you want to tell us that we should avoid? The discussion that we've had is we think that we can handle the issues in generalities without disclosing names, without disclosing details that would be contrary to certainly the spirit of the protective order and that we're comfortable that we can proceed with argument on that basis. What do you think they want to do? They're okay with it.  That's fine. Thank you, sir. I just want to let you notice that this is a recording in terms of our FTR goal system, and it's subject to be released upon request to the public. So I just want you to know that just because the courtroom seems empty except for law clerks mostly, that there is access to the public later for this recording. I just want to tell you that. Thank you, Your Honor. All right, with that. May it please the Court. Okay. Would you set this clock to zero? Yes, sir. Thank you. Again, may it please the Court. Your Honor. Your Honor, three points that I'd like to make. All of these, I think, the issues I'm about to talk about, it seems to me, based upon the evidence, and I would submit would entitle the plaintiff to a jury trial and that, in essence, it was improper for the Court to decide this motion on summary judgment. The first issue I'd like to address is one that the Court has specifically asked us to address, and that has to do with the immunity issue with respect to the extrinsic statements of Defendant Elliott. And just to refresh the Court's recollection of those statements and the context in which they were made, let me state that these statements occurred at the end of the shift of this lab tech, approximately 4 o'clock in the afternoon, some several hours after the alleged sexual incidents occurred. Counsel, maybe we can save you a little time because we're familiar with the factual part. Your Honor, I think the question that is raised is with respect to Elliott, are the comments she made at whatever point, is there a question of absolute immunity or statutory conditional immunity? Your Honor, let me say, first of all, having reviewed the common law as well as the statutory law, as well as the Hagley case, which I think is probably the definitive word on the subject, there really is no difference, it seems to me, in the common law analysis of the immunity issue. I think it's perfectly consistent with the statutory qualified immunity to which the plaintiff is granted in this case. If we look at the, just look at the common law basis for immunity, in those cases that are similar to the ones before us where statements were made before a formal investigation, specifically speaking about the Calder case, the Gersh case, the McDermott case, all those cases held that statements made prior to an investigation that were not part of a public function, and I say that because I think there needs to be some interpretation of what that means, but I'm going to take that to mean public function equates with public interest. Because in those cases where there was no public interest issue, the courts ---- That would go to absolute immunity. Well, I think the courts are saying Calder, if you take the Calder case as our example of this case, where there were statements made to the police alleging that an employee had committed theft within the context of the employment situation. Those statements were not privileged. Those statements were not absolutely privileged. And the Gersh case, it seems to me, is the same, and I believe McDermott also. Those were statements that were made prior to an investigation, and they didn't rise to the level of a public interest issue such as those that the police contend. Counsel, I don't want us to get hung up here and use all the time on this one particular issue, but it seems like to me it comes down to absolute immunity means what it says. It's absolute immunity. Correct. And the Maryland legislature has adopted several statutes that in this particular area, dealing with medical review committees, seems to take a much more narrow view of things. Maryland Court of Appeals has not opined on that yet. But if that's correct, if the Maryland legislature has abrogated absolute immunity in this area to a certain extent, then the conditional immunity requires, as I understand it, an initial finding of good faith, which apparently wasn't argued or a decision made in the district court, and then there are particular limitations in the statutes on to whom that qualified immunity applies and the situations in which it does apply. So I'm not sure if your argument is that it doesn't make any difference between absolute and qualified immunity. It would seem to me that there is a difference. I'm not saying that at all. There absolutely is a difference. That's why we're here. And that's why the motion to dismiss should not have been granted. The judge, as you recall, said, I'm persuaded there's absolute immunity. If this only applies to Ms. Elliot? This only applies to Elliot, yes. Is there any significance to the fact that Elliot's not part of this appeal? Well, Elliot is part of this appeal. Well, she's not an appellant and she's not an appellee. It's what it says right on the front of your brief. Your Honor, I filed it. If you'll note from the record, we filed an appeal from the granting of the motion to dismiss. She's not here. She didn't show up, according to the briefs, according to the paperwork. She's not an appellee. She's an individual. She's a defendant. She was a defendant, I guess. I understand.  Nobody filed a brief on her behalf. That's absolutely the case. My motion. It says right there that Sinerka and the Carroll Hospital are the appellees. The board of directors and Elliot are individually their defendants. But they're not appellees. I understand, Your Honor, but we filed our appeal on the order of the lower court. I understand. I'm just worried about the fact that she's not in here. It makes no difference. I don't know. I'm not saying it does. Nobody's mentioned it. Nobody's complained about it. Nobody's complained about it yet, until now. That's right. Nobody's complained about it. But the fact of the matter is, what other avenue did I have? I did what I had to do. I filed my motion, my appeal, based upon what I thought was an improper motion. In fact, I don't believe that she does have absolute immunity. And I think that the Court of Appeals has spoken very clearly in the Hegley case, which we've cited in our response to our supplemental brief. There's no question that the good faith language that's contained in 637 is the same language that's contained in 620. And that good faith language has been interpreted in Hegley to, by its very definition, by the very plain words. Wouldn't your position be, then, counsel, with respect to the question of immunity as to Elliot, and whether there's any derivative application of that to somebody else, that we would either have to get the Court of Appeals of Maryland to tell us which type of immunity applies, and if it was qualified immunity, it would have to go back to the district court, because there's no basis upon which we could find that. Or, as I understand, you're also arguing that you think Maryland law is clear enough that qualified immunity is the only immunity applicable. I say that because Hegley has, the Court of Appeals has decided Hegley. And when it decided Rite Aid versus Hegley, it interpreted the exact same language in 5620 as that which is contained in 5637B. It's the exact same language. And the Court has held that that is automatically, by its plain words, means that qualified immunity applies. Now, this issue only applies to the state law claims? Yes. Correct. Correct. To the extent it's here, it's on the state law claims. That's right. There are federal claims and state claims. Both, Your Honor. That's correct. All right. And so I think that law, that is very clear. And the federal claims are the 1981 claim. That's correct, Your Honor. Sorry if I'm confusing. I don't mean to. But, yes, we're talking now only about the supplemental issues that you've asked us to address. And I think with respect to that, Judge Agee is absolutely correct. We contend this is qualified immunity. I only disagree in the sense that I think that issue has been decided. I don't think there's any issue here. The plain language says she only enjoys qualified immunity. And I'll go one step farther on that issue because I anticipate you will hear the argument that in Hegley, for example, a summary judgment was granted on the good-faith issue. And I would submit to Your Honors that we never got that opportunity because when Judge Motz decided the issue on the motion to dismiss, we never had a chance to conduct any discovery. She was out of the case at that point. Absolute immunity was the only issue discussed in the district court. Qualified immunity was never addressed. Is that right? We never had the opportunity, in my recollection. We never had the chance to even make any discovery because there was no oral argument and there was no discovery, and I think just they were briefing and that was it. So at least in terms of that particular issue, Your Honor, I think certainly the case goes back on that issue. Your Honor, the second point, if I could, is to talk about, if I may, address the issue of the prima facie case because I think it's very clear that the plaintiff satisfied the burden of proof with respect to the prima facie case. And I say that because at least with respect to three prongs of that case, that is, the evidence which is required to be presented in order to shift the burden, I don't think there's any real issue that that was not done. We know, for example, that certainly Dr. Shibaka is a member of protected class. We know that he is a surgeon, a thoracic, cardiothoracic surgeon who is performing his job in the manner that was anticipated. What's a protected class? African American, Your Honor. The 1981 specifically applies to race cases. Absolutely. Is that what you're limited to? And that's what you're pursuing? Exactly. You're pursuing the 1981 race case? Correct. All right. And so we know that, and we know that there was a dispute about whether he was performing to the expectation of the employer. Not a real dispute. What Judge Motts had tried to interject was because he had this allegation against him of sexual harassment, he wasn't performing his job. I don't think there's any interpretation by any court that has suggested that that prong of the case simply means he was performing the function of his job as his duties required, and in this case was as a surgeon. But that would be a tautology then, because the whole issue is did he do what he's alleged to have done? Well, Your Honor, I think the difference is in how the case, the context of the case. There are cases where that particular prong is extremely important. For example, Your Honors may recall in the Merritt case, which is a Fourth Circuit case, the question was the fitness of the person to do the job. So there was a direct relationship. But this is not a question about whether he was performing his job as a surgeon. These allegations are extrinsic to that. And so the question then becomes the next prong, I submit to Your Honors, the next prong is the question of whether there was disparate treatment. And I submit to you there's overwhelming evidence of disparate treatment in this case. And specifically, if you look at the Fifth Circuit and Graham, which I've cited in our brief, and also the Humphreys case in the Seventh Circuit, one has to look at the comparability of the issues, the comparability of the people involved. But that does not mean that there has to be absolute comparability. So I think one of the major issues that Your Honors are going to have to decide in this case is where are these comparable situations? And I would submit they were absolutely comparable situations, as close as you can get for a perfect match. You have several white physicians similarly situated who had the same basic allegations against them. One in particular, far more egregious, I submit to Your Honors, than anything that the plaintiff in this case engaged in. We have the same code of conduct. I'm sorry? Can you identify your best case comparator without breaching confidence? No. Not without breaching confidence. You can just talk about him generically. I can tell you generically he's far worse than anybody else. You've got it all spelled out in your sealed brief. We do. We do. Although your point is you think that you've clearly raised a factual question beyond 12B6. Absolutely. It's clearly a factual dispute. I mean, if comparability is an issue. It seems to have limits here, because I don't know whether we're prohibited from questioning you about those examples or not, because it seems like to me that goes to the essence of your case, because if we don't believe that they're matching comparators, you would have to lose on that point. That's true, but the names are in the brief. The evidence is in the appendix. I'm simply pointing out that if you review those documents, you're going to see that the similarly situated white physicians, same occupation, same profession, subject to the same credentialing process, were treated differently. There were five of them. What happens if they weren't subject to the last chance agreement? Well, one was. We know that one was. The worst offender was. And he's not only been given one chance, he's been given two chances. He's never lost his job. Their list of the list of offenses. What happens if that comparator had no founded charges against him on the last chance agreement? I'm sorry? What happens if that comparator has no founded charge against him under the last chance agreement? Well, neither did the plaintiff. There's absolutely no difference. They both entered into this. Well, I don't see how you can say that as to the plaintiff. That's the whole point of this case. Obviously the board and the hearing panel found that there were founded charges. That's just the point, though. He was required, the defendants in this case, the appellees in this case, applied the code of conduct differently for him compared to the five others, and specifically this one. They forced him to go to a hearing in which the hearing panel even questioned the credibility of the accuser. The board then arbitrarily overturned the hearing panel. But the bottom line is the same conduct that was alleged against this one most egregious physician didn't even get him to the point where a hearing was required. He wasn't even accused of violating or he wasn't even revoked and then had to go to a hearing. The plaintiff in our case was revoked based upon not only failure to follow the code of conduct, but in fact with a total disregard for the fact that a similarly situated white never even had to get to that process, never even got that far. Now, stop me if I go too far because I want to be sensitive to where we are here. Are you saying that that comparator was at the level of last chance? Indeed. Then after that point had an allegation against him of the same nature and was not, it was neither terminated or made to go through a board process. Is that what you're saying? No, I'm saying that those allegations which caused my client to have a probable cause finding and a revocation against him were the exact same conduct that was charged against the other person, but that white, similarly situated white did not have to go through the process, was not revoked. That's the difference. Isn't that because there was no founded charge? There was no evidence? There was, Your Honor, the point is that they had such a body of evidence that my client didn't even get a chance to even respond to the accuser. This particular doctor not only had a chance to respond to them, but he was found, despite his responses, he was found to have violated not just coworkers, but patients as well. He goes to, under the same last chance agreement, he goes to the same psychologist picked by the hospital that my client goes to, found to have far more serious problems requiring much more monitoring than my client did, and keeps his job. Not only that, he does it again. He is found to have violated, again, sexual harassment. After he was sent to medical? After, and then he was sent back to that same group again who re-evaluated him. But he's still there, and my client is not. That's the difference. Thank you. Thank you. Yes, may it please the Court. Robin Lochnagle, I'm here for the hospital, for John Cernulka, and for Jamie Elliott. And I would like to clear up any confusion about that on the record. When this appeal was filed, it was only filed against the hospital and John Cernulka. But you didn't file a brief for Ms. Elliott. Yes, we did. Well, it says here, names the others. Your Honor, if you look at the signature line on both briefs, it lists all of the defendants that we represent, all of the appellees that we represent, and it does include Jamie Elliott. And we submitted briefs on behalf of Jamie Elliott throughout that. And we explained why we did what we did in footnote 25 on page 51 of our original brief when we explained that because the appeal was only filed against John Cernulka and the hospital, it was unclear whether they could even pursue the claim against Jamie Elliott. But we assumed that they would be permitted to, and we briefed on her behalf in that event. And we certainly do represent her here. And you filed an appearance on her behalf? Yes, sir, absolutely. And I apologize for any – This is erroneous. I apologize – The cover sheet's wrong. I apologize for any confusion caused by the cover sheet. We attempted to do what we thought was the right thing procedurally in a difficult procedural status. I would like to address, first of all, the question of absolute immunity on the – Well, before you go, are you – is part of your argument that Jamie Elliott is not before the court and that the plaintiff has failed to put her before? I'm a little confused as to what you're saying. Your Honor, we made the – we made a technical argument that she's not properly before the court because the appeal was not properly filed. But we went on to address the substantive issue. I think your brief was in this footnote. It's just in the footnote, Your Honor. And we are here fully prepared to address the issues on the merits on Jamie Elliott's behalf. With regard to absolute immunity, the Maryland Court of Appeals has recognized absolute immunity. In many, many cases, it's a doctrine that has its roots in the judicial immunity. But it's been applied by the Maryland Court of Appeals, in particular, to protect complaints of abuse by persons in a position of public authority or trust where there are fully adequate procedural safeguards to test the veracity of the complaint that's been made. And that was clearly established in the Reichart v. Flynn case. It was established in the Imperial v. Drapeau case, Novotny, and a whole series of cases where public officials – and that could be a high school teacher. It could be the police. It could be a certified – We don't have any public officials here. This is all private. You have the Maryland legislature enacting statutes specifically going to medical review committees and setting out a level of immunity and a test for that and descriptions of the circumstances in which that immunity applies, which would seem to indicate under just general canons of construction that the Maryland legislature has carved out this area from whatever applicable common law absolute immunity may have existed before. Your Honor, it's our contention that the Maryland medical review statute does not completely occupy the field, nor does it abrogate this specific immunity. And I just want to mention, before I talk about the statutory privilege, that one of the applications that the Maryland Court of Appeals recognized was in Imperial v. Drapeau. It was a certified EMS personnel, and they applied the privilege because of his importance as being certified by the State of Maryland to act in the public interest through emergency dispatch. And I would submit that a licensed physician, subject to licensure of the State Board of Medicine, is in the same status as a person in a position of public trust. Now, the medical peer review or medical review committee privilege is a very broad privilege that provides qualified immunity for, very, very broadly, for peer review oversight activities, hospital credentialing, informal departmental peer review, morbidity and mortality conferences, activities of the board, activities of the EMS service. These are all State law issues, right? Right. And this is... You haven't asked us to certify anything, have you? No, we have not, Your Honor, because we believe that this decision... You think it's so easy we can figure it out. We believe that this Court can decide this issue based on reasoned and principled decisions. And you think that, well, why don't you... Listen, you think you ought to win the 1981 case. We do. That Judge Mott's ought to be affirmed. Yes, sir. And then we need to take up the State law claims. That's correct, sir. And decide them in your favor. Why wouldn't we... If we rule in your favor on the 1981 claims, why wouldn't we remand or have the District Court remand the State law claims to the State court from which they were removed and let the State courts resolve these things? Okay. Why would we want to get into it and undertake to certify or anything? Why wouldn't we just send it back to the State court? We have done that in lots of cases. Well, Your Honor, the State court claims were fully resolved by Judge Mott's through the application of the Federal Health Care Quality Improvement Act privilege. That's called HICWA privilege, which provides complete immunity for the hospital, for John Cernulca, and it would have provided immunity for Jamie Elliott, were she a party in the case at the time, based on the application of four objective standards. And the Federal law is intended, of course, to promote peer review. It's intended to promote activities to proactively address issues of conduct and quality. Well, is there a position that HICWA covers Elliott in the defamation claim? Yes, sir. If she were a party to the case, and that was one of our alternative arguments on the issues that the Court raised, which is that even if the Court were to determine Was she named as a defendant? Yes, she was named as a defendant, and along with the hospital and John Cernulca. And the issues Is she named as a defendant in the 1981 case? She was named as a defendant in the 1981 case and a State defamation case. The 1981 case was dismissed by Judge Motz on the basis that she, as the lowest of the low-level employees of the hospital, could not possibly have influenced the decision-making of the Board of Directors of the hospital. 1981 is a contract claim. She didn't have any authority to contract on behalf of the hospital, did she? Exactly. And so that's why he dismissed the claim against, the 1983 claim against Jamie Elliott, leaving only 1981 claim. Leaving only the defamation claim, which Judge Motz dismissed on the basis of the absolute immunity. I would like to just address briefly So you don't want to, you don't think, you think we have to decide all this immunity stuff rather than sending it back to the State Court? I think that an alternative I mean, your only hook, the only hook to get it in here is the 1981 case. That's the only way it got in Federal Court. That is absolutely correct, Your Honor. And was brought to the State Court. Right. And alternatively, if the, as an alternative grounds for disposing of it, this Court could recognize, as Judge Motz did, that the HICWA immunity entirely insulates the hospital and all of its employees. In which case, even if the Court were to disagree with the dismissal based on absolute immunity, it would be in the nature of harmless error because Jamie Elliott clearly would have been titled to the same HICWA immunity that the other defendants were afforded. Even when acting under malice? Yes, because HICWA immunity is decided on an objective standard and it is decided completely independent of any personal malice, any negative animus of any kind. The only issue under HICWA is were the four procedural standards met and those standards were, was this action taken in furtherance of quality health care? And there's no dispute that it was. Dr. Schabotka concedes it. Second, was there a reasonable investigation done of the allegations that arose? And the record is replete with the evidence that there was a very thorough investigation done, excuse me, both at the time of the probable cause determination and then through the lengthy hearing process, the lengthy board process, and to final decision-making by the board. Third prong of HICWA is was there an adequate notice in hearing? The hospital in this case meticulously adhered to its bylaws. It followed all procedures. And Dr. Schabotka really doesn't contest that. His challenge to the hearing is that certain of the rulings that were made by the panel during the hearing he disagrees with. There was evidence that was excluded. By the way, there was hospital evidence that was excluded as well as Dr. Schabotka's evidence, and he says we disagree with these rulings, we disagree with the way it all played out, and that means it was unfair. And that's not a basis for challenging the fairness and adequacy of notice in hearing under HICWA. And finally, the last ---- To be sure. Yes. With respect to Ms. Elliott, you read Judge Motz's opinion to say to give rulings for her in the alternative, one under absolute immunity with respect to the defamation claim but separately under HICWA for the same claim? No. He did not grant her dismissal under HICWA. We didn't argue that because that's something that could really only be determined under summary judgment on a summary judgment record. My argument is that the HICWA defense would encompass her. Clearly, it's appropriate on the full summary judgment record. So if we found since Elliott was dismissed under 12b-6 or 12b-1, not under summary judgment, if we determined that the absolute immunity determination was incorrect, then it would be we would have no basis upon which to apply HICWA to her at this stage. I would submit that because the evidence and arguments ---- I'm sorry. Because the issues are so closely intertwined with the issues against the hospital and the issues against John Cernulka, there was full discovery of all issues. Dr. Chewbacca was not precluded in any way of delving into anything related to Jamie Elliott because it was her complaint that was the basis of all of the subsequent actions, that this Court could review the summary judgment record, and if it affirmed and agreed that HICWA was appropriate, that that would govern any claims as against Jamie Elliott as well. That's our position, sir. So you're asking us to turn this into summary judgment for Elliott? Yes, and there is some cases cited in our brief that provide precedent to that where claims are dismissed early on in the case, but the case continues through full summary judgment and they are fully litigated and the Court can decide that on a summary judgment record. That has been held to be harmless error in this circuit and in others. There's no discovery in this case so far. Our contention, sir, is that he had full discovery of all issues relating to Jamie Elliott because they were at the heart of the issues against the hospital. He either did or didn't. Was there a discovery period? What was the cutoff period? There was at least 10 months of discovery, I believe. Was the judge granted summary judgment on the 1981 claim or dismissed the 1981 claim? He dismissed it, yes. He dismissed the 1981 claim? Yes. Because of absolute immunity. I'm sorry. He dismissed the – I apologize. He dismissed the claim as to Jamie Elliott. It was still very much alive and it is still alive today on appeal as to the hospital and as to John Cernulca. And my position is that – Well, what did he do? You say you don't have a final order then? No, we do have a final order dismissing – So he threw out the 1981 claim? Yes, he threw out the 1981 claim as to Elliott on motion to dismiss. It wasn't a summary judgment. It was a motion to dismiss. That is correct, sir. That's as to Elliott. That is just as to Elliott. I thought, well, he had a 1981 claim against the hospital. Yes. Did he throw it out on – No, no, no. He – we didn't move to dismiss the 1981 claim. They don't have a final order? On 1981 as against the hospital and against John Cernulca, we do not have a final – Well, how do we hear? Well, now we do. I'm not sure we have a long-term jurisdiction. You all haven't briefed that either. But if you don't have a final order, we can't hear this thing. No, no, no. I'm sorry. I have confused the court. Is the 1981 case out? It's done. Against everybody? It's done. Against everybody. On dismissal? On – no. I'm sorry. Well, it couldn't be summary judgment because you didn't finish discovery. No. I apologize for confusing the court. Discovery is over. Summary judgment has been granted on the 1981 claim as to the hospital and as to John Cernulca. So it was – he granted a dismissal as to Ms. Elliott? Yes. And he granted summary judgment as to the hospital and the CEO? And the CEO. Exactly. Yes. So there's – so that's the appeal from – on the 1981, the federal claim? Yes. Is from a dismissal as to Elliott and from summary judgment award as to the others? That's exactly right. Now, if I could – And so you say there is a final order? Yes. Absolutely. Okay. If I could briefly address the comparator evidence. And, again, I – in light of the sensitivities, I'll be general, but I think I can squarely hit it. There are two groups of comparators. One group are physicians as to whom there was some type of report or complaint once, an isolated report or complaint, which the hospital addressed through its usual custom and practice, the same that it applied to Dr. Shibaka, which was a sit-down counseling, education, and warning session, where that physician was told of his or her – his, I'm sorry, obligations, and was – and agreed and understood that the conduct would not be repeated. And in those other five or six cases, the conduct was not repeated. And that evidence is clear and undisputed in the record. Then we have the one comparator who is an employee of the hospital's employment group, physician group. And so in the – procedurally, it's a different case because it arose in the office setting. It was – the person in charge of that was an administrator of the physician practice group. There was no complaint in the hospital. There was no basis of acting in the hospital under the hospital procedures. So it was treated very differently to begin with. But, substantively, it was treated in the same way, in that these serious allegations were investigated. The physician was sent to counseling and evaluation, and there was a last-chance agreement. The last-chance agreement provides that if there is one further complaint that is determined to be credible by the administrator after investigation, then that will lead to termination. That was that physician's agreement. Similar agreement for Dr. Shibaka, where it led to suspension and then a medical staff process, resulting in board. That other physician did not have a complaint that was determined to be credible. There is reference to a complaint. It was investigated by the administrator. It was determined not to be substantiated. It was something that came up as a result of something a patient said. And when the patient was interviewed, she said, no, I never said that, or she said, I don't have any problems with this doctor, he's a fine doctor. And so it was not a substantiated complaint. Because it was not a substantiated complaint, no action could be taken, no action was taken on that complaint. And that's the only evidence in the record, and there is no so that the comparator is not a comparator. Let's stop there. Yes. That comparator was given an opportunity for an investigation. For example, as you said, that investigation disclosed that the patient either changed or, well, anyway, somehow. But that's what the plaintiff is saying here. He didn't get that opportunity. He went straight to a board of review. Well, that is incorrect, sir, and it's very, very clear. That's a factual dispute. No, no, it's not a factual dispute, because it's undisputed in the record what investigation he got. It's very clear in the record that Jamie Elliott, the complainant, was interviewed. All her supervisors were interviewed. They were interviewed by two members of the team. The team looked at it together. They looked at the prior history, which we haven't even discussed, which dated back to 2006 and episodes in 2008 and episode in 2010. They looked at the entire history. They did an investigation. They assessed the credibility, and they determined that this complainant, and it was actually two complaints, Elliott, and then there was another anonymous complainant in about the same time period, both of them were credible. And because they were credible, then they moved on to the rest of the process. And that is what makes these two, this case, not a true comparator. It has to be the same in every respect. And in this, it's different because of the different setting and the different decision makers, but more importantly it's different because there was no confirmed credible complaint in that last instance, whereas here there was. So we're supposed to accept that it's true? It is uncontroverted in the record, sir, that there was no complaint that was determined to be credible. Your Honor works. I apologize, Your Honor. That's disrespectful. I apologize. All right. There was no, the uncontroverted evidence in the record. So as a matter of law, that competitor fails? Based, yes, absolutely, fails. On the 12B1, 12B6, you said? Yes, sir. It fails as a matter of law because there is no evidence in the record that would enable him to get past prima facie. And even if he did get past the prima facie case. Wait a minute. Was this on a 12B6, or was this a summary judgment? I'm sorry. It was summary judgment. Yes, sir. Evidence in the record fully established after discovery raised no issue of a true comparator. Secondly, the hospital clearly had a valid nondiscriminatory reason to terminate this physician's privileges. It was his sexual harassment of hospital staff, his violation of the last chance agreement and hospital policy. There is absolutely no evidence in the record that would call into question the veracity and the genuineness of that decision-making. What about as to Elliot? Excuse me? In terms of granting dismissal for her on these factual questions, she maliciously made this up. She is, first of all, are you talking about, do we have a 1981 claim against Elliot, do they? Right. The answer is she is the lowest of the low employees in this hospital. In order to have 1981 against her, she would have to have influence on the final decision-maker. She'd have to have the ear of the board. She does have influence. You just said it was based all on her credibility. She set in motion a process. All she did was to file a complaint. And that's the whole case you had. Did you have any case other than that? That was the ultimate decision. That was the whole case, correct? Her allegation was the sole basis for his termination. Is that right? It is the sole basis of the board's ultimate decision terminating, yes, sir. And you're saying she had little influence? I am saying, Your Honor, that in order to have influence for purposes of 1981, she would have had to have been in a decision-making capacity. All she did was to file a complaint. And the decision-makers were Mr. Cernulco, were the hearing panel, was the board. Those were the people that made the decision based on the evidence that was presented before them. And all she did was to come forward and make a complaint and do what she was asked to do. Who corroborated her testimony as to what she said he did? Who corroborated her testimony as to what she said he did? Nobody. There was nobody that actually saw the incident. Right. So she was everything. Just the classic type. But she wasn't an agent. She didn't do that as an agent of the hospital. So for 1981 purposes, she's an employee. She made a complaint. Would that make her an agent, doesn't it? It doesn't make her an agent for purposes of decision-making. For 1981, she wouldn't be an agent in terms of if she maliciously came up with this? I'm calling what they alleged. Right. That she did this based on his race, made this up so that he could get fired. Isn't that the allegation? Your Honor, all of the- Isn't that the allegation? That is certainly the allegation. But I would submit to you- You said in 1981 that they would not have a case, that that's born to be true, that they did this? Yes. There's no case there? Yes, sir. It is my position because the line of cases are very clear that it has to be someone that actually influenced, was in a supervisory or managerial position or close to the decision-maker in a way that inappropriately influenced that decision-making. But that would be inappropriate influence if you maliciously lied about it and you're the only person without corroboration. Well, Your Honor, let's assume that she lied. That lie would have been tested through various layers of appeal. How would it not have been tested other than just repeating it? It was tested through a full evidentiary hearing. You believed her. That's all it was. Well, not just- Excuse me, counsel. Excuse me. Yes. It's not rocket science. You believed her. It's nothing rocket science by that. You believed her. You said every- repeating, wait a minute, about it. And this is by allegation. That's why we normally test these things in terms of fact-finding and not just, you know, dismissal. She's saying, they're saying she lied. Every step of the way, it's the same lie, uncorroborated, as they allege it. So I don't think it gets any better or more scientific or more objective. It's like I said, you believed it. But, Your Honor, that is why we have such an extensive process of investigation, decision-making, and review. So John Cernulca believed her. His senior staff members believed her. The three members on the hearing panel who heard her testify under oath and heard Dr. Shabaka testify under oath at a hearing where the hospital had the burden of proof believed her. The board of directors reviewing the transcript believed her so that it wasn't- so that the issue was all along the way, it was tested. It was tested through these layers of decision-making. It wasn't like Jamie Elliott had the power and the authority to say, I want Dr. Shabaka gone, and that happened. She could not possibly have done that. And I believe that 1981 and the jurisprudence of 1981 requires that type of stature for an individual who is not the ultimate decision-maker to be held liable. Well, talking about the origin of 1981, what did you understand the origin of it, the purpose of it, why Congress passed it? It was to combat racism and to- Not racism, not racism, but to combat- Racial discrimination. Racial bigotry, discrimination. Racism is something different. People always confuse that. But some of the racial bigotry and discrimination based on in terms of a person being able to carry on their job, contract, do those kind of things that normal Americans did and African Americans couldn't. That's what the statute is saying. The whole issue is whether or not your life is changed because someone has racial animus and bigotry against you. That's what they allege. But you're telling me the person is not significant at all, as they allege, who lied about this. Again, this is an allegation. I understand. But at some point, don't we assume that these things, if they're well-planned, to be true? Your Honor- Don't we? I would submit to you that after the full discovery and summary judgment record has been developed, if there is not- Elliot is not on summary judgment. I'm not- Yes, sir. Elliot, that's not on summary judgment. But we're- Respectfully, you're reviewing it based on a summary judgment record in which there is not one iota of evidence anywhere. Even Dr. Shabaka testified at his deposition that he didn't think that Jamie Elliot had any racial animus against him. He testified to that. He testified at the medical staff hearing. He acknowledged that she was a reliable and trusted employee. In the summary judgment record, there is not a whiff of any information. Did you move the summary judgment for Elliot? No, sir. Of course we didn't because she had already been dismissed from the case. All right. And so I know I'm well over my time. No, I'm not going to ask any questions. You're okay. Okay. All right. That's it. Okay. I would just request the Court respectfully that it affirm the summary judgment in favor of the hospital and Mr. Sernolke and that it affirm the dismissal of Jamie Elliot from the case. Thank you. Your Honors, this is how objective this investigation was. I refer to the appendix, page 513. This is what happened. After Elliot had filed this report in the manner that was required by the Code of Conduct, this is what the investigation consisted of, talking to people who knew nothing about the incident whatsoever except for one person. That one person was an eyewitness that proves Shabaka was correct and did nothing. She was there at the time of the second incident that was alleged. She saw nothing that would create any suspicion of a sexual assault. And yet the investigators didn't even ask her any questions about it. They just assumed she didn't see anything because Elliot had told her she came in after the fact. Was she called to testify at the hearing? And that's exactly why the hearing panel did not find Elliot credible in that second incident because there was an eyewitness. Was she called to testify at the hearing? I'm sorry, Your Honor. Was she called to testify? She was indeed. And in the cross-examination you will see I asked her over and over again, what did you see? Did you see anything that would have smacked if somebody had just been assaulted? And she said no. And that is the reason why the hearing panel said we don't find her credible on that issue. And yet, to show you how fair this hospital is. Where did the hearing panel find that she was not credible? I'm sorry? Where did the hearing panel find that? We do not find enough evidence to support the second allegation on the second incident. She was not credible. There may have been a failure of proof on part of the hospital or Ms. Elliot, but I don't recall any place in the record where they found her not credible. Well, Your Honor, the only evidence was Elliot. If the only evidence is Elliot and they say you have not met your burden, what is the difference between saying that and that that person was not credible on that issue? It's not sufficient evidence that they found certain events transpired and you could take the events two different ways and you had to meet a certain standard. Then I would like to have the opportunity. How did they find the witness not being credible? Then I would appreciate the opportunity to explore that, a chance which I was not given because Judge Motz threw out the case on motion with respect to Elliot, so I never got the opportunity to deal with that. But this was not an investigation. Here's the first statement that comes out of the HR, the Human Resources Investigator, so-called, page 513. I opened the meeting with Jamie to apologize to her for what had happened and that we're so proud of her for having the strength to come forward with her experience. Is that an unbiased investigation? Not once was Dr. Shibaga asked to come and give his side of the story, and as Your Honor, Judge Gregory has said, Sernolco simply accepted what this committee found based upon the uncorroborated testimony of this witness, which ultimately, at least as to one of the incidents, was not proved, and yet that was yanked away. And so here you have Sernolco basing his, he never even talks to Shibaga, he refuses to. He said, I didn't want to hear anything from him. He said, I'm going to ruin your life. I don't want to hear what you have to say. So not only did the HR folks not give him a chance to give his side of the story, as they gave the five other white guys, but not even Sernolco did. In fact, Sernolco comes over and gives the paper and has his gun strapped to him. It's like the Wild West. And if that wasn't designed to intimidate, I don't know what was. But we never even got a chance to explain how this system failed Dr. Shibaga. Totally failed him. But it didn't fail the white guys because they're still there. Thank you, counsel. We will ask the clerk to adjourn the court for today, and then we'll come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, Robert B. King, G. Steven Agee